**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA**

DR. DONNA HESTON,
     **Plaintiff,**

v.
                                       **Civil Action No.: 1:26-cv-00092-TSK**
                                       **Judge: Thomas S. Kleeh**

THE MARION COUNTY BOARD OF EDUCATION,

DONNA COSTELLO, in her individual and official
capacity as a member of the Marion County Board of
Education;

KEVIN ROGERS, in his individual and
official capacity as a member of the Marion County
Board of Education; and

JAMES SAUNDERS, in his
individual and official capacity as a member of the
Marion County Board of Education,

     **Defendants.**

---

### FIRST AMENDED COMPLAINT

     **COMES NOW** the Plaintiff, Dr. Donna Heston, by counsel, Ryan J. Umina, Esq., and

the law firm of Umina Legal, PLLC, and, pursuant to Rule 15(a)(1) of the Federal Rules of Civil

Procedure, for her First Amended Complaint against the above-named Defendants, states as

follows:

### INTRODUCTION

     This action arises from a sustained, sex-based campaign waged against Dr. Donna

Heston, the Superintendent of Marion County Schools, by three members of the Marion County

Board of Education — Defendants Donna Costello, Kevin Rogers, and James Saunders — who

seized upon and spread a false accusation that Dr. Heston was in an intimate relationship with another woman, Kristin DeVaul, the County's Administrative Assistant of Human Resources.

That accusation was false, but its truth is immaterial. Acting on it, the three Board members interrogated Dr. Heston about her private life, surveilled her social media, demanded that she recuse herself, predetermined and then declined to renew her contract notwithstanding a positive performance evaluation, and — after learning that she had asserted her rights — extended her only the minimum one-year contract term while continuing to subject her to gender-based hostility.

The discrimination is established not principally by Dr. Heston's word, but by the Board members' own recorded statements, the Board members' own written messages, the written statement of a sitting Board member, and the Board's own public records. Dr. Heston brings this action under Title VII of the Civil Rights Act of 1964, the Fourteenth Amendment to the United States Constitution as enforced through 42 U.S.C. § 1983, and the West Virginia Human Rights Act, to redress the violation of her rights and to recover the damages she has suffered.

## JURISDICTION AND VENUE

1.      Jurisdiction is conferred upon this Honorable Court pursuant to 28 U.S.C. §§ 1331, 1343, and 1367, as this action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1983, and as this Court has supplemental jurisdiction over the related claims arising under the West Virginia Human Rights Act, W. Va. Code § 16B-17-1 *et seq.* (recodified from W. Va. Code § 5-11-1 *et seq.* effective February 8, 2024).

2.      Plaintiff has satisfied all administrative prerequisites to suit under Title VII.

3.      Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission, dual-filed with the West Virginia Human Rights Commission and

designated EEOC Charge No. 533-2026-01803, alleging sex discrimination including discrimination based on perceived sexual orientation, hostile work environment, and retaliation.

4.    On May 5, 2026, the United States Department of Justice, Civil Rights Division, issued Plaintiff a Notice of Right to Sue. *See* Notice of Right to Sue (Attached hereto as "Ex. 1").

5.    Plaintiff commenced this action within ninety (90) days of her receipt of that Notice.

6.    Venue is proper before this Honorable Court pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), as the Defendant Board resides in this District, the relevant employment records are maintained in this District, and the unlawful employment practices complained of were committed in Marion County, which lies within the Clarksburg Division of the Northern District of West Virginia.

**PARTIES**

7.    Plaintiff, Dr. Donna Heston, Ed.D., is a citizen of the State of West Virginia who has served as the Superintendent of Marion County Schools since July 1, 2021 ("Superintendent" or "Dr. Heston").

8.    Dr. Heston presently serves under a one-year contract for the 2026–27 school year, with a base salary of $149,135, a $5,000 supplement for her doctorate, and total compensation of approximately $164,440 inclusive of benefits.

9.    Defendant Marion County Board of Education is a public body corporate and a political subdivision of the State of West Virginia, organized and existing under the laws of the State of West Virginia, with its principal offices at 1516 Mary Lou Retton Drive, Fairmont, West Virginia 26554 (the "Board").

10.     The Board is an "employer" within the meaning of Title VII and the West Virginia Human Rights Act.

11.     The Board is a "person" subject to suit under 42 U.S.C. § 1983.

12.     At all times relevant herein, the Board acted under color of state law.

13.     The Board holds final policymaking authority over the employment, contract term, and continuation of the county superintendent pursuant to W. Va. Code § 18-4-1 *et seq.*

14.     The votes and directives of the Board's members constituted official acts of the Board's final policymaking authority over the personnel matters at issue.

15.     Defendant Donna Costello is and was at all times relevant herein an elected member of the Board, sued in her individual and official capacities ("Defendant Costello").

16.     Defendant Costello has served in leadership roles on the Board, including as its President.

17.     At all times relevant herein, Defendant Costello acted under color of state law.

18.     Defendant Kevin Rogers is and was at all times relevant herein an elected member of the Board, sued in his individual and official capacities ("Defendant Rogers").

19.     At all times relevant herein, Defendant Rogers acted under color of state law.

20.     Defendant James Saunders is and was at all times relevant herein an elected member of the Board, sued in his individual and official capacities ("Defendant Saunders").

21.     Since July 6, 2026, Defendant Saunders has served as President of the Board.

22.     At all times relevant herein, Defendant Saunders acted under color of state law.

23.     Defendants Costello, Rogers, and Saunders are referred to herein as the "Individual Defendants," and together with the Board as the "Defendants."

24. The conduct of the Individual Defendants described herein was undertaken within the scope of their official authority as Board members, and, where committed outside formal Board proceedings, constituted the exercise and abuse of the authority their offices conferred.

**FACTS**

**DR. HESTON, MS. DEVAUL, AND A FABRICATED RELATIONSHIP THREE BOARD MEMBERS WOULD NOT LEAVE ALONE**

25. Dr. Heston became Superintendent of Marion County Schools on July 1, 2021, under an initial one-year contract running through June 30, 2022.

26. The Board thereafter reappointed Dr. Heston under a successive multi-year contract commencing July 1, 2022.

27. Dr. Heston served continuously as Superintendent, under contract, through June 30, 2026.

28. Under Dr. Heston's leadership, the district undertook substantial facility and safety improvements across buildings that are predominantly eighty to ninety years old, including the construction of Safe Schools secure entrances at nineteen of the district's buildings.

29. During Dr. Heston's tenure, two of the district's elementary schools earned National Blue Ribbon recognition from the United States Department of Education — Jayenne Elementary School in 2023 and Pleasant Valley Elementary School in 2024.

30. During Dr. Heston's tenure, the district's student achievement has ranked among the top twelve districts in the State.

31. When Dr. Heston became Superintendent, the district ranked second in the State for personnel overages, driven by declining enrollment and State funding, and during her tenure the district improved to fifteenth in the State.

5

32. Under Dr. Heston's leadership, the district grew its career and technical education programming by more than two hundred percent.

33. During Dr. Heston's tenure, the district met all State indicators for effectiveness as defined by the West Virginia Department of Education.

34. Kristin DeVaul has served the Marion County school system for eighteen years.

35. Ms. DeVaul serves as the County's Administrative Assistant of Human Resources and works at the central office.

36. Beginning no later than early 2023, the Individual Defendants seized upon, and began advancing, the accusation that Dr. Heston and Ms. DeVaul were engaged in an intimate, same-sex relationship.

37. That accusation was and is false.

38. Acting upon that accusation, the Individual Defendants subjected Dr. Heston to a sustained campaign of sex-based harassment, surveillance, interrogation, and — upon her assertion of her rights — retaliation.

39. The campaign described herein is documented by the Individual Defendants' own recorded words, by their own written messages, by the written statement of a sitting Board member, and by the Board's certified public records.

**THE HARNED ALLEGATIONS AND THE BOARD'S ADOPTION BY SILENCE**

40. On or about January 29, 2023, Ian Harned, an Assistant Principal then subject to pending disciplinary action, sent an email directly to the members of the Board falsely alleging that Ms. DeVaul had solicited him for a sexual "threesome" — a fabrication that, by its nature, implicated both Ms. DeVaul and Dr. Heston — and had promised him a principal's position in exchange (the "Harned Allegations").

6

41.     The Harned Allegations were fabricated in their entirety.

42.     From their inception, the Harned Allegations sexualized the professional relationship between the two women and targeted them together.

43.     Ms. DeVaul immediately retained counsel, who, on February 9, 2023, issued a written response copied to the Board members characterizing the Harned Allegations as vexatious and salacious and warning of legal exposure for defamation.

44.     Although the Board members received both the fabricated email and the attorney's rebuttal, the Board never investigated, repudiated, or discredited the Harned Allegations, and no Board member defended Ms. DeVaul.

45.     Instead, the false sexual narrative supplied ammunition for the discriminatory campaign that followed.

## DEFENDANT COSTELLO'S INTERROGATIONS OF THE SUPERINTENDENT

46.     In a recorded conversation from approximately March 1, 2023, Defendant Costello raised with the Superintendent what she described as "nasty rumors" about Dr. Heston and Ms. DeVaul.

47.     The rumors were not an aside; they were the subject of the conversation, and Defendant Costello returned to them repeatedly.

48.     In the same conversation, Defendant Costello admitted: "The good old boy network still exists. It's just taken on a different face."

49.     In the same conversation, Defendant Costello treated a male administrator's habit of taking lengthy personal telephone calls in the school parking lot as unremarkable, even as she scrutinized two women for associating.

7

50.    Ten months later, Defendant Costello returned to the subject — this time announcing that it was not a debate.

51.    On or about January 29, 2024 — one year to the day after the Harned email — Defendant Costello convened a private meeting with Dr. Heston and, after approximately eight minutes of routine county business, stated: "Dr. Donna, I told you that we needed to have a conversation and this, it's not a debate."

52.    There followed an interrogation of the Superintendent by Defendant Costello, lasting approximately twenty-five minutes, concerning a perceived sexual relationship with a subordinate, Ms. DeVaul.

53.    Defendant Costello admitted on the recording that she had raised the subject a year earlier, telling the Superintendent: "I had come to you in regard to those insinuations and rumors and innuendos a year ago and those have not died down."

54.    Defendant Costello tied Ms. DeVaul's professional advancement directly to the fabricated relationship, stating: "I don't think you cannot know that when you appointed Kristin DeVaul or recommended Kristin for that position . . . I think that's when shit hit the fan."

55.    The premise of the interrogation — that a woman's professional advancement is explained by a sexual relationship rather than by her qualifications — is itself a stereotype about women.

56.    The premise was also false, and Dr. Heston corrected it on the recording, stating that she was not on the committee that hired Ms. DeVaul, did not recommend her, and had nothing to do with that committee's selection of Ms. DeVaul for the supervisor's position.

57.    Defendant Costello did not acknowledge the correction and continued to press the subject of the fabricated relationship.

8

58.    When Dr. Heston protested that the rumors were defaming her, Defendant Costello instructed her to "set the affair aside."

59.    Defendant Costello stated, as to the fabricated affair, "personally, I don't care," treating the defamatory false accusation as established fact.

60.    Dr. Heston confronted Defendant Costello, on the recording, with specific comparators — male and female — none of whom had ever been suspected, surveilled, restricted, or accused.

61.    Dr. Heston identified two male administrators who were, in her words, best of friends — men who drank beer together nightly, were seen together in public, fished together, stayed out all night together, and "stayed in the same rooms together."

62.    Dr. Heston identified two other male administrators who fished together and stayed at the same camp together, and asked Defendant Costello whether those men were sleeping together.

63.    Dr. Heston identified two male administrators so close that each referred to the other's children as family, at every public event.

64.    Dr. Heston identified a female administrator and her immediate female supervisor who sold real estate together, traveled together, and stayed together — a relationship closer than anything between the Superintendent and Ms. DeVaul — and asked Defendant Costello whether either woman had ever been accused.

65.    When Dr. Heston asked whether the male administrators were sleeping together, Defendant Costello answered, "Well, that's not my business."

9

66.   Near the end of the same recording, Defendant Costello told the Superintendent to "put your big girl panties on," and conceded, when confronted with the male administrators' identical relationships: "Well, I know it's a good old boy network and it still exists."

67.   The perceived sexual orientation of the male administrators was not the Board's concern, while that of the two women was.

### THE CONCEALED NORTH MARION MEETING: SURVEILLANCE, A SUNSHINE-LAW VIOLATION, AND A BOARD MEMBER'S OWN WORDS

68.   In or about July 2025, Defendants Costello and Rogers traveled together to North Marion High School and met privately, for approximately ninety-eight minutes, with an assistant principal at the school, in a meeting concealed from the Superintendent and captured on a recording (the "North Marion Meeting").

69.   During the North Marion Meeting, Defendants Costello and Rogers each disclosed to a subordinate employee, outside any public meeting, how they intended to vote on the Superintendent's contract renewal.

70.   Defendant Costello then stated, "We're not supposed to say stuff" — a real-time admission that the Board members knew they were not supposed to be making such statements.

71.   The Board members continued the discussion notwithstanding that acknowledgment.

72.   Defendant Saunders was identified during the meeting as holding the same position, making a third member of the five-member Board whose position on the pending personnel decision was communicated through private, back-channel conversation.

73.   By those disclosures, a quorum of the five-member Board communicated their positions on a pending personnel decision outside any public meeting, in violation of the West

10

Virginia Open Governmental Proceedings Act, W. Va. Code § 6-9A-1 *et seq.*, rendering the later public vote a ratification of a decision reached in secret.

74.     This allegation is pleaded as evidence of predetermination and pretext, and not as an independent cause of action.

75.     During the same meeting, Defendant Rogers revealed that he had been monitoring Dr. Heston's and Ms. DeVaul's social-media accounts, citing photographs of the two on vacation together, and demanded that Dr. Heston recuse herself from any matter involving Ms. DeVaul.

76.     Other district employees routinely posted photographs together without any Board member treating those posts as evidence of an improper relationship.

77.     The social-media surveillance was applied exclusively to the two women.

78.     The assistant principal acknowledged during the meeting that Ms. DeVaul was better qualified than he for the position she held, conceding that she "had a better resume."

79.     Upon learning of the North Marion Meeting, Dr. Heston felt compelled, in separate recorded conversations with Defendant Rogers and with Defendant Costello, to reiterate to the Board members that she is not a lesbian.

### THE RUMOR SPREADS THROUGH THE SCHOOLS, AND THE SUPERINTENDENT IS MADE TO ANSWER FOR IT

80.     Over the course of three and a half years, the false rumor of an intimate relationship between the Superintendent and Ms. DeVaul spread through the district's schools and the Marion County community.

81.     The rumor reached Dr. Heston's own subordinates, and, in recorded conversations with school staff, Dr. Heston was forced to deny a fabricated account of her own private life to the employees she supervises.

82. No male superintendent has ever been made to account to his subordinates for a rumor about his sexuality.

83. The Individual Defendants — the very officials responsible for the district's governance — propelled and advanced the rumor rather than taking any action to correct it.

84. At no time did any Individual Defendant take any corrective action to address the harassment Dr. Heston and Ms. DeVaul were suffering.

**THE EXECUTIVE-SESSION CONFINEMENT OF
MS. DEVAUL AND THE SUPERINTENDENT'S PROTECTED OBJECTION**

85. In August 2025, during an executive session regarding Ms. DeVaul at which all Board members and the Superintendent were present, Defendants Saunders and Costello directed that Ms. DeVaul could not leave her office during the workday, could not travel with the Superintendent to professional meetings, and could not visit the schools she was hired to serve (the "August 2025 Directives").

86. No comparable directive was ever issued to any male employee of the district.

87. The August 2025 Directives were incompatible with the duties of an Administrative Assistant of Human Resources and impaired Ms. DeVaul's ability to perform her job.

88. Dr. Heston objected to the August 2025 Directives, citing their interference with Ms. DeVaul's rights and with her ability to perform her duties.

89. Dr. Heston's objection was protected activity under Title VII and the West Virginia Human Rights Act.

90. On December 16, 2025, Defendant Saunders again confronted the Superintendent in executive session, questioning why Ms. DeVaul had attended a West Virginia Association of

12

School Administrators conference in Wheeling and again directing that Ms. DeVaul not leave her office.

91.    Defendant Saunders himself regularly attends social and professional events in the company of male employees of the district, including one male employee in particular, without objection from any member of the Board.

92.    Two female central-office administrators had attended an overnight conference together two weeks earlier without objection, and male administrators routinely traveled and socialized together without scrutiny.

93.    The restrictions on Ms. DeVaul remained in effect.

94.    The August 2025 Directives are corroborated by the written statement of sitting Board member Tom Dragich, which states: "In executive sessions I was present and heard James Saunders tell the Supt that she is not permitted to let Kristen [sic] DeVaul leave the office."

95.    The Dragich statement further provides that Defendant Saunders "does not seem to care that male administrators attend meetings together," that "[a]ll Board members and the Supt were present in this meeting," and that "[t]his was not the first time he has done this."

96.    The Dragich statement thereby independently corroborates both the August 2025 Directives and the December 16, 2025 confrontation.

97.    Mr. Dragich handwrote his statement and hand-delivered it to Dr. Heston, and the statement was transmitted by email on February 24, 2026 — eight days after the non-renewal vote and two days before counsel's letter of representation.

98.    The Superintendent's own in-state and out-of-state travel has likewise been scrutinized, although such travel is expressly provided for in her contracts, dating back to her

initial employment, as it was in the employment contracts of previous superintendents of the district.

## THE COMPARATOR DOUBLE STANDARD

99.    A male employee of the Board holds the identical position code and credential as Ms. DeVaul and serves at the same central office ("Male Employee No. 2").

100.    The Board has never confined Male Employee No. 2 to his office, surveilled his social media, or questioned his personal relationships — including his regular public socializing with Defendant Saunders, the very member who directed Ms. DeVaul's confinement, and his travel with other male county-office administrators, including overnight travel, and his public socializing with them in personal and professional capacities.

101.    The Board's own official minutes reflect its routine approval, in each fiscal year from 2021–22 through 2025–26, of in-county and out-of-county travel by male administrators.

102.    The same Board that routinely approved that travel confined Ms. DeVaul to her office and questioned her attendance at a single professional conference.

103.    The discriminatory character of Defendants' conduct is confirmed by the treatment of similarly situated employees who were never suspected, surveilled, restricted, or accused — male administrators who socialized, traveled, and stayed together, and a female supervisor and subordinate whose relationship was closer than anything between the Superintendent and Ms. DeVaul.

104.    None of those employees drew an interrogation, a recusal demand, a confinement directive, or a surveillance campaign.

105.    Defendants reserved that treatment for two women they perceived to be in a same-sex relationship.

14

**THE PREDETERMINED NON-RENEWAL AND THE PUBLIC VOTES**

106.    On February 5, 2026, the Board evaluated Dr. Heston's performance and found that she met standards on three goals and exceeded standards on two.

107.    That evaluation was conducted at a special meeting of the Board that was streamed live to the public on the Board's webpage, in violation of W. Va. Code § 18-4-6(d), which mandates that the evaluation of a county superintendent occur in executive session.

108.    Eleven days later, on February 16, 2026, the Board convened its regular session with all five members and Dr. Heston present. *See* Official Minutes of the February 16, 2026 Regular Session (Attached hereto as "Ex. 2").

109.    On a motion by Defendant Costello, seconded by Defendant Saunders, the Board entered executive session at 4:33 p.m. specifically to discuss agenda item 4309, the renewal of Dr. Heston's contract, and returned to open session at 5:06 p.m.

110.    Mr. Boyles then moved, seconded by Mr. Dragich, to approve a three-year renewal of Dr. Heston's contract, and the motion failed by a vote of two to three, with Defendants Costello, Rogers, and Saunders each voting no.

111.    Mr. Dragich moved, seconded by Mr. Boyles, to approve a two-year renewal, and the motion failed by the same two-to-three vote, with the same three Defendants voting no.

112.    Mr. Boyles moved, seconded by Mr. Dragich, to approve a one-year renewal, and the motion failed by the same two-to-three vote, with the same three Defendants voting no.

113.    Defendant Costello then moved, seconded by Defendant Rogers, to let Dr. Heston's contract expire and to put out a search for a new Superintendent.

114.    Defendant Costello's motion failed by a vote of two to two, with Defendant Saunders abstaining, and the official minutes record that no action was taken.

15

115.    The three members who voted against every renewal term — Defendants Costello, Rogers, and Saunders — are the same three members whose conduct is described herein, while the two members who voted for renewal had taken no part in the discriminatory campaign.

116.    On February 20, 2026, the Board convened a special session whose sole substantive agenda item was "Discussion and Action on a New Superintendent's Contract and Term to Begin July 1, 2026." *See* Official Minutes of the February 20, 2026 Special Session (Attached hereto as "Ex. 3").

117.    The Board spent that special session in a thirty-one-minute executive session, from 10:03 a.m. to 10:34 a.m., and the official minutes record that no action was taken.

118.    The non-renewal had been predetermined through private, back-channel communications among a quorum, as set forth herein, and the deliberation that produced the February 16 votes occurred behind closed doors, in an executive session, before the pre-formed votes were cast in public.

119.    Given the Superintendent's positive evaluation eleven days earlier, no legitimate, performance-based explanation accounts for the result.

120.    The three members who voted against renewal never publicly stated any reason for their votes.

## THE BOARD NARROWS ITS OWN JUSTIFICATIONS

121.    On or about February 19, 2026, the Board issued a public statement representing that its decision regarding the Superintendent's contract was unrelated to any allegation involving any student matter and denying that the decision concerned any misconduct or "cover up." *See* Board Public Statement of February 19, 2026 (Attached hereto as "Ex. 5").

122.    By disavowing a student-matter or misconduct rationale, the Board narrowed the field of available justifications and reinforced the inference of discriminatory motive.

123.    On or about February 28, 2026, WV News published an editorial identifying Defendants Saunders, Costello, and Rogers by name in connection with their treatment of the Superintendent, placing the controversy — and Dr. Heston's name — before the public and compounding the reputational harm she has suffered in the small community in which she lives and works, and throughout the State, impairing her future employment opportunities and her career.

### THE POST-NOTICE RETALIATION:
### RECONSIDERATION, A ONE-YEAR TERM, AND SAUNDERS

124.    On or about March 2, 2026, counsel submitted a formal written demand for settlement on Dr. Heston's behalf.

125.    On the same date, the Board convened its regular session with all five members present.

126.    At that March 2, 2026 session, the Board voted five to zero to place the Superintendent's contract back on its agenda and convened an executive session in which the Board learned of Dr. Heston's pending claims.

127.    When Dr. Heston advised the Board to consult legal counsel before acting on the reconsideration, Defendant Saunders replied that he already had.

128.    Each member of the Board therefore had actual knowledge of Dr. Heston's claims no later than March 2, 2026.

129.    On March 4, 2026 — two days after the Board learned of Dr. Heston's claims and one day before the reconsideration vote — Defendant Saunders publicly shared, on his personal Facebook account, a post by a Marion County parent alleging that Marion County Schools and

associated officials had violated federal and West Virginia law in connection with a student matter, including through what the post described as deliberate indifference, retaliation, and procedural obstruction.

130.    The post Defendant Saunders shared urged the public to "share it spread it," asserting that "these are just the codes and laws they have broken."

131.    The allegations Defendant Saunders amplified were of the very character the Board's February 19, 2026 public statement had disavowed as any basis for its decision regarding the Superintendent's contract — allegations involving a student matter, misconduct, and a claimed "cover up."

132.    Upon information and belief, Defendant Saunders deleted his share of the post the same day.

133.    Coming two days after the Board learned of Dr. Heston's claims, Defendant Saunders' public amplification of an alternative narrative his own Board had disavowed — followed by its same-day deletion — reinforces the inference that the Board's stated and shifting explanations are pretextual.

134.    On March 5, 2026, the Board convened a special session and immediately entered an executive session, from 1:01 p.m. to 2:28 p.m., to discuss Board matters concerning an employee. *See* Official Minutes of the March 5, 2026 Special Session (Attached hereto as "Ex. 4").

135.    Following that executive session, Defendant Saunders moved, seconded by Mr. Boyles, to reconsider the vote for a one-year contract for Dr. Heston, and the motion passed three to two, with Defendants Costello and Rogers voting no.

136.     Mr. Dragich then moved, seconded by Mr. Boyles, to offer a one-year contract to Dr. Heston, and the motion passed three to two, with Defendants Costello and Rogers again voting no.

137.     Having joined the unanimous March 2 vote to place the contract back on the Board's agenda, Defendants Costello and Rogers thus reversed course after learning of Dr. Heston's claims, voting against the very reconsideration they had just approved.

138.     Three days after learning of Dr. Heston's claims, Defendants Costello and Rogers thus voted against even reconsidering the non-renewal, and then against the shortest contract term available.

139.     West Virginia law authorized the Board to employ its superintendent for a term of one to four years, and the Board's own March 5 agenda noticed the appointment of a county superintendent "to serve a one to four year term beginning July 1, 2026." W. Va. Code § 18-4-1.

140.     With the full statutory menu of terms noticed and before it, the Board extended Dr. Heston the minimum, and took no action on the separately noticed appointment item, leaving the replacement option open on the same agenda.

141.     Defendant Saunders also stated publicly that the Board owed no explanation for its decision on the Superintendent's contract.

142.     The one-year term, extended by the very members who had sought to remove her and awarded only after the Board learned of her claims, constituted a materially diminished term of employment relative to the multi-year contracts she had previously held and was eligible to receive, as reflected in the executed contracts maintained in her personnel file.

143.     Upon information and belief, Dr. Heston is the only renewed county superintendent in the State of West Virginia serving under a one-year contract.

## DEFENDANTS ROGERS AND COSTELLO SEARCH THE SUPERINTENDENT'S RECORDS FOR AMMUNITION AND A PRETEXT

144.    In March 2026, the West Virginia Department of Education's Office of Accountability conducted an on-site review of the district for the purpose of evaluating governance, with visits on March 13 and March 24, 2026.

145.    On March 9, 2026 — one week after the Board learned of Dr. Heston's claims and four days before the Office of Accountability's first on-site visit — an attorney retained by Defendants Rogers and Costello in their personal capacities submitted to counsel for the Board a seven-part records demand concerning, among other things, the compensation, vacation-day payments, training costs, and travel and lodging expenses of the Superintendent and central-office administrators.

146.    The demand stated on its face that the information was being requested "in order for Board members to prepare for the meetings scheduled for Friday, March 13th, with the State Board of Education's Office of Accountability."

147.    The district treated the demand as a public records request, and the resulting production — reaching stored files, receipts, and reimbursement records dating to July 1, 2021 — consumed the time of the Superintendent's office and of the district's Treasurer.

148.    The district's own records reflected that neither Dr. Heston nor Ms. DeVaul had engaged in any out-of-state travel during the 2025–26 fiscal year, while other central-office administrators traveled with Board approval.

149.    Two of the three Individual Defendants thus prepared for the State's review of their own Board's governance through a privately retained attorney, with demands directed at the records of the very administrators they had been scrutinizing.

150.    The conduct described in this section is pleaded as evidence of motive, concert, and pretext, and not as an independent cause of action.

### SAUNDERS' ACTIONS OF MARCH 27, 2026: "WE ARE YOUR BOSS," "IT'S NOT GOING TO GET EASIER," AND "BUT YOU ARE A WOMAN"

151.    On or about March 27, 2026, Defendant Saunders — who days earlier had cast the deciding vote for the one-year term — summoned Dr. Heston to a one-on-one, closed-door meeting outside any formal evaluation process.

152.    During that meeting, Defendant Saunders presented Dr. Heston with a list of matters on which he said she needed to improve and told her "it's not going to get easier."

153.    Defendant Saunders told Dr. Heston, "we are your boss."

154.    Defendant Saunders called Dr. Heston "one of the smartest women" he knew, and when she asked him to say "superintendents" rather than "women," he replied, "but you are a woman."

155.    Defendant Saunders asked Dr. Heston for a hug.

156.    Defendant Saunders questioned why Dr. Heston referred to him as "Mr. Saunders" rather than "Reverend Saunders," though he does not refer to her as "Dr. Heston."

157.    The March 27 encounter combined assertions of authority with gender-based remarks and boundary-crossing conduct, and occurred after the Board was on notice of Dr. Heston's claims.

### THE CONDUCT CONTINUES AFTER THE EEOC NOTICES

158.    The conduct did not abate after Dr. Heston filed her administrative charge or received her Notice of Right to Sue.

159.    On or about April 30, 2026, during a Special Olympics event attended in an official capacity, Defendant Costello told an assistant principal that her mood was poor because

21

she had to look at "the woman who filed a half-million dollar lawsuit against her," a reference made within the hearing of school personnel tying a Board member's treatment to the assertion of legal rights.

160.   On or about May 5, 2026, Defendant Costello was returned to the Board in the county's primary election, while the Board member who had supported the Superintendent did not seek reelection.

161.   Going into the 2026–27 school year, the three members responsible for the conduct described herein continued to sit on the Board to which the Superintendent reports.

162.   The Office of Accountability delivered its report to the Board members and the Superintendent on April 21, 2026, in an executive session, as the WVDE recommended.

163.   The Office of Accountability required the district to submit a corrective action plan within thirty working days of the report's delivery.

164.   Under Dr. Heston's leadership, the district submitted its corrective action plan on May 7, 2026, within the deadline, with input solicited from Board members, county office administrators, principals, and the Superintendent.

165.   The Office of Accountability approved the corrective action plan subject to revisions that included "[t]he addition of very clear language and protocols concerning board members visiting schools and communicating directly with employees, thus undermining the chain of command," as stated in the Office of Accountability's written approval correspondence.

166.   The State thus prescribed written protocols addressed to the very conduct by Board members described in this Complaint.

## JULY 27, 2026: DEFENDANT SAUNDERS
## REPEATS THE RUMOR AND ACKNOWLEDGES IT IN WRITING

167.    At the Board's July 6, 2026 reorganization meeting, Defendant Saunders was elected President of the Board.

168.    Upon information and belief, Defendant Saunders was elected President with the votes of his co-Defendants, Costello and Rogers.

169.    At the same reorganization meeting, Defendants Costello and Rogers were named co-vice presidents of the Board by newly elected President Saunders.

170.    Upon information and belief, the designation of two vice presidents departed from the Board's ordinary practice.

171.    The three Individual Defendants thus assumed the Board's entire elected leadership, acting in concert, in the weeks before the events described below.

172.    On July 27, 2026, Dr. Heston and Defendant Saunders held a regularly scheduled meeting between the Board President and the Superintendent, conducted by telephone, to review the agendas for the Board's upcoming August 3 and August 5, 2026 meetings.

173.    The meeting — ordinarily conducted face to face — was calendared on Dr. Heston's schedule for 11:00 a.m. and began at 11:19 a.m., when Dr. Heston placed the call after concluding a meeting with a teacher.

174.    When the meeting concluded, Defendant Saunders failed to disconnect the call, leaving the telephone line open.

175.    Over the open telephone line, near the end of his remarks, Dr. Heston heard Defendant Saunders tell the others: "She's the lesbian and I hate that for her because she's beautiful but to each his own."

176.    Defendant Saunders made these statements while still connected to a telephone call conducted in his official capacity as Board President, in the immediate wake of official Board business.

177.    Defendant Saunders' statement tied Dr. Heston's perceived sexual orientation to her physical appearance.

178.    Dr. Heston immediately went to the office of Ms. DeVaul and recorded Defendant Saunders' statement in a contemporaneous handwritten note.

179.    Ms. DeVaul — the other woman targeted by the same rumor — then heard Defendant Saunders' continuing remarks over the still-open telephone line.

180.    At 11:35 a.m., with the telephone line still open, Dr. Heston sent Defendant Saunders a text message stating: "You didn't hang up. Who did you tell I am a lesbian because I am not and that is inappropriate that you are telling people that about me." *See* Defendant Saunders' July 27, 2026 Text Message Exchange and Call Record (Attached hereto as "Ex. 6").

181.    The telephone line remained open until 12:41 p.m. — one hour and twenty-two minutes after the call was placed, and the same minute at which Dr. Heston's message to Defendant Saunders was marked as read.

182.    At 12:50 p.m., Defendant Saunders responded to Dr. Heston in writing: "I just got your message if you listen again to what I said, I said people say she is and and [sic] people say she's having it with my good friend Bobby, but I don't care to bother me".

183.    Dr. Heston's message had asked only about the statement that she is a lesbian.

184.    Defendant Saunders' written response volunteered a second statement he had made to others: that Dr. Heston was "having it" with a married man he identified as "my good friend [name redacted]."

185.   Defendant Saunders' written response acknowledged that he had made both statements to other persons that day.

186.   Defendant Saunders' written account of his statement — that he had said only what "people say" — differed from the statement Dr. Heston heard and contemporaneously recorded in writing.

187.   Defendant Saunders' written response confirmed that he was continuing to spread the same false statements in July 2026 — three and a half years after Defendant Costello first raised them with the Superintendent.

188.   Dr. Heston responded to Defendant Saunders in writing, denying that she is a lesbian, denying that she has affairs with married men, and stating that she had repeatedly been required to make the same denials to Defendant Saunders and Board members.

189.   Defendant Saunders repeated and acknowledged these statements more than two months after the EEOC issued Dr. Heston's notice of right to sue, and more than four months after he stated, on March 2, 2026—on August 3, 2026, he asked Dr. Heston if she was going to "apologize now or later."

## THE PERCEPTION ON WHICH DEFENDANTS ACTED WAS A PERCEPTION ABOUT SEX

190.   The perception on which Defendants acted — that Dr. Heston is a woman in a same-sex relationship — is a perception about sex, and discrimination on that basis is discrimination because of sex.

191.   A plaintiff need not be gay or lesbian in fact; it is enough that the employer acted on its perception, as Defendants did here.

**CONTINUING VIOLATION AND ONGOING INJURY**

192.   The acts described herein are related in nature, recurred with reasonable frequency from no later than 2023 through the present, and were committed by the same three Board members.

193.   The hostile work environment described herein comprises a series of related acts that collectively constitute a single unlawful employment practice, at least one act of which occurred within the applicable charge-filing period.

194.   The February 16, 2026 non-renewal votes, the March 5, 2026 award of only a one-year term, the March 27, 2026 meeting, and the retaliatory acts described herein each occurred within the applicable charge-filing period.

195.   Dr. Heston continues to serve as Superintendent through June 30, 2027, under, and reporting to, the same Board on which the Individual Defendants continue to sit.

196.   The restrictions, the hostility, and the insecurity of a one-year term are present, ongoing, and continuing injuries that Dr. Heston suffers as of the filing of this Complaint and will continue to suffer absent relief.

197.   The public non-renewal, the minimum one-year term, and the controversy generated by the Defendants' own conduct have impaired, and will continue to impair, Dr. Heston's ability to obtain comparable employment as a superintendent or school administrator.

198.   The declaratory and injunctive relief sought herein would redress those ongoing and continuing injuries.

**THE DEFENDANTS REFUSE RESPONSIBILITY AND GROW MORE EMBOLDENED**

199.    Before filing this action, Dr. Heston, through counsel, attempted to resolve these matters without the need for litigation.

200.    The Defendants refused to take responsibility for their conduct.

201.    Instead, the Individual Defendants grew more emboldened: they consolidated the Board's entire elected leadership among themselves, and, within weeks of assuming the presidency, Defendant Saunders repeated the false statements about the Superintendent's private life.

202.    In July 2026, Defendant Saunders informed Dr. Heston that she is not permitted to attend Board meetings by telephone or virtually.

203.    On July 22, 2026, the Board met, with Defendant Rogers chairing and Defendant Saunders participating by telephone.

204.    Defendant Saunders thus attended a Board meeting by telephone shortly after informing Dr. Heston that she is not permitted to do the same.

205.    Before the July 22, 2026 meeting, Defendant Saunders sent Board members a written "President's Update," excluding Mr. Dragich and the Superintendent from its distribution.

206.    At the July 22, 2026 meeting, immediately after the Superintendent delivered the Superintendent's Update — a long-standing agenda item — Defendant Saunders asked the members aloud whether they had received his "President's Update."

207.    Mr. Dragich and the Superintendent received the President's Update only after the meeting had concluded.

208.    Dr. Heston remains the Superintendent of Marion County Schools, leading the district she has served with distinction, under the daily authority of the same three Board members whose conduct is described in this Complaint.

209.    She has pursued every avenue short of this one: she corrected the record with the Board members directly, she objected through the channels her office afforded, she completed the administrative process before the EEOC, she cooperated fully with the State's own corrective process, and, through counsel, she invited resolution without litigation.

210.    Each of those efforts was met with denial, escalation, and a further consolidation of the Defendants' power.

211.    This action is the only recourse that remains.

**COUNT I — TITLE VII OF THE CIVIL RIGHTS**
**ACT OF 1964 — SEX DISCRIMINATION, INCLUDING**
**DISCRIMINATION BASED ON PERCEIVED SEXUAL ORIENTATION**
**(Against the Marion County Board of Education)**

212.    Plaintiff hereby incorporates by reference paragraphs 1 through 211 as if stated verbatim herein.

213.    Title VII makes it unlawful for an employer to discriminate against an individual with respect to the compensation, terms, conditions, or privileges of employment because of such individual's sex. 42 U.S.C. § 2000e-2(a).

214.    The Board, acting through the Individual Defendants, penalized Dr. Heston for a close professional association with a female colleague that the same Board members tolerated, without comment, between male administrators.

215.    A man in Dr. Heston's position, perceived to maintain the identical association with Ms. DeVaul, would not have been interrogated, surveilled, or restricted, as Defendant Costello's own recorded words — "Well, that's not my business" — confirm.

28

216.    Sex is accordingly the but-for variable in the treatment Dr. Heston received.

217.    Applying the words of the statute as written, an employer who intentionally penalizes a woman for conduct or associations it tolerates in a man discriminates against her "because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1); *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020).

218.    Under *Bostock*, an employer that discriminates against an individual for being homosexual necessarily discriminates against that individual because of sex.

219.    The same rule applies where, as here, the employer acts on its perception of an employee's sexual orientation, for an employer that acts on perceived homosexuality acts on the same sex-based premise.

220.    The Board, acting through the Individual Defendants, intentionally discriminated against Dr. Heston because of her sex, including their perception that she is in a same-sex relationship.

221.    The Board's discrimination included, but was not limited to, the February 2026 non-renewal of Dr. Heston's contract notwithstanding a positive evaluation, the award only of a materially diminished one-year contract term, and the discriminatory alteration of the terms and conditions of her employment.

222.    The Board's performance-neutral justifications are pretextual, as the Superintendent's evaluation was satisfactory, the Board publicly disavowed any student-matter or misconduct rationale, and the decision was predetermined.

223.    Sex was a motivating factor in, and the but-for cause of, the adverse actions taken against Dr. Heston.

224. As a direct and proximate result of the Board's unlawful conduct, Dr. Heston has suffered and will continue to suffer damages including diminished and insecure terms of employment, lost and reduced compensation, emotional distress, humiliation, embarrassment, reputational harm, impairment of future employment opportunities, loss of enjoyment of life, and other damages to be proven at trial.

225. Plaintiff is entitled to compensatory damages, equitable relief including back pay and front pay, and reasonable attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k).

## COUNT II — TITLE VII OF THE CIVIL
## RIGHTS ACT OF 1964 — HOSTILE WORK ENVIRONMENT
### (Against the Marion County Board of Education)

226. Plaintiff hereby incorporates by reference paragraphs 1 through 225 as if stated verbatim herein.

227. Dr. Heston was subjected to unwelcome conduct based on her sex and perceived sexual orientation.

228. A false rumor that a female employee's professional standing rests on a sexual relationship rather than on merit invokes a deeply rooted gender stereotype and double standard — the perception that women, rather than men, use sex to achieve professional success — that leaves women susceptible to degrading labels in a way men are not, and harassment premised on such a rumor is harassment because of sex.

229. In *Parker*, the Fourth Circuit held that an employer's participation in the circulation of precisely such a rumor about a female employee, and its restriction of her duties because of it, states a hostile-work-environment claim; here, the rumor's principal propagators were the governing members of the employer itself. *Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297 (4th Cir. 2019).

230. The Fourth Circuit has likewise recognized, applying *Bostock*, that a plaintiff may prove harassment is based on sex where the plaintiff is perceived as not conforming to traditional sex stereotypes, and that the evidentiary routes for proving sex-based harassment are not limited to any closed list. *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 121 (4th Cir. 2021).

231. That conduct was sufficiently severe or pervasive to alter the conditions of Dr. Heston's employment and create an abusive working environment, including, but not limited to, a three-and-a-half-year spread of the rumor through the district's schools and community, the Superintendent's forced denials of the rumor to her own subordinates, recorded interrogations of the Superintendent by Defendant Costello, in March 2023 and again in January 2024, concealed surveillance of her private life, the August 2025 and December 16, 2025 executive-session directives restricting her administrative team, a publicly streamed evaluation, a non-renewal cast by the rumor's own propagators, Defendant Saunders' March 27, 2026 closed-door meeting, with its gender-based remarks and demanded hug, Defendant Saunders' July 22, 2026 written "President's Update" circulated to Board members to the exclusion of the Superintendent, and his renewed publication of the rumor on July 27, 2026, acknowledged in his own written message.

232. Conduct need not be both severe and pervasive to be actionable, and a hostile work environment may be established by virtue of the severity of the conduct.

233. Whether conduct is sufficiently severe or pervasive is measured by the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating rather than a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance.

234.    Here, the conduct was continuous rather than isolated, spanning 2023 through 2026; it preoccupied the Superintendent, the Board, and district staff; it was humiliating, forcing the Superintendent to deny a fabricated account of her private life to her own subordinates; and it unreasonably interfered with the performance of her duties, through the restriction of her administrative team, the scrutiny of her contractually provided travel, her exclusion from the President's Update, and the bar on her attending Board meetings remotely.

235.    The conduct included Defendant Costello's recorded interrogations and demeaning directives, the concealed surveillance of Dr. Heston's private life, the recusal demand, and Defendant Saunders' March 27, 2026 closed-door meeting.

236.    The environment was both subjectively and objectively hostile.

237.    The conduct is imputable to the Board because it was committed by the members of the Board itself, the body that is Dr. Heston's employer and its highest authority, and because it culminated in tangible employment actions including the non-renewal and the diminished one-year term.

238.    As a direct and proximate result of the hostile work environment, Dr. Heston has suffered and will continue to suffer damages including emotional distress, humiliation, embarrassment, reputational harm, impairment of future employment opportunities, loss of enjoyment of life, lost and reduced compensation, and other damages to be proven at trial.

239.    Plaintiff is entitled to compensatory damages, equitable relief, and reasonable attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k).

**COUNT III — TITLE VII OF THE
CIVIL RIGHTS ACT OF 1964 — RETALIATION
(Against the Marion County Board of Education)**

240.    Plaintiff hereby incorporates by reference paragraphs 1 through 239 as if stated verbatim herein.

241.    Dr. Heston engaged in protected activity, including objecting to the discriminatory restrictions imposed on Ms. DeVaul, conduct she reasonably believed unlawful.

242.    An employee's complaints to her employer about a sex-based rumor of this character are themselves protected activity. *See Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297 (4th Cir. 2019).

243.    Dr. Heston further engaged in protected activity by confronting Board members about their sex-based treatment of her professional relationship, by causing a formal settlement demand to be submitted on or about March 2, 2026, and by filing her Charge of Discrimination.

244.    The Board took materially adverse actions against Dr. Heston that would dissuade a reasonable worker from making or supporting a charge of discrimination, including the award of only a one-year contract term, the March 27, 2026 meeting, and the continuing hostile treatment thereafter.

245.    During the March 27, 2026 meeting, weeks after the Board learned of Dr. Heston's claims, Defendant Saunders warned the Superintendent that "it's not going to get easier" and told her "we are your boss."

246.    The decisionmakers had actual knowledge of Dr. Heston's protected activity at the time they acted.

247.    The Board learned of Dr. Heston's pending claims in the March 2, 2026 executive session, and three days later Defendants Costello and Rogers voted against even reconsidering

the non-renewal and then against the one-year term, while the Board as a whole extended only the minimum term with the full one-to-four-year statutory menu noticed and before it.

248.    The retaliation and hostility continued through July 27, 2026, when Defendant Saunders repeated the rumor of a sexual relationship and acknowledged in writing that he had done so.

249.    Dr. Heston's protected activity was the but-for cause of the materially adverse actions.

250.    As a direct and proximate result of the Board's retaliation, Dr. Heston has suffered and will continue to suffer damages including emotional distress, humiliation, embarrassment, reputational harm, impairment of future employment opportunities, loss of enjoyment of life, lost and reduced compensation, and other damages to be proven at trial.

251.    Plaintiff is entitled to compensatory damages, equitable relief, and reasonable attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k).

**COUNT IV — 42 U.S.C. § 1983**
**— DENIAL OF EQUAL PROTECTION OF THE LAW**
**(Against Defendants Costello, Rogers,**
**and Saunders, and the Marion County Board of Education)**

252.    Plaintiff hereby incorporates by reference paragraphs 1 through 251 as if stated verbatim herein.

253.    42 U.S.C. § 1983 provides a remedy for the deprivation, under color of state law, of rights secured by the Constitution of the United States.

254.    The Equal Protection Clause of the Fourteenth Amendment prohibits intentional sex-based discrimination by state actors, which is subject to intermediate scrutiny and requires an exceedingly persuasive justification.

34

255. Discrimination targeting a female employee based upon the perception that she is in a same-sex relationship rests upon sex-based stereotypes and constitutes intentional sex-based discrimination subject to intermediate scrutiny.

256. At all times relevant herein, the Individual Defendants acted under color of state law.

257. The Individual Defendants intentionally treated Dr. Heston differently from similarly situated male administrators because of her sex and perceived sexual orientation, through the interrogations, surveillance, recusal demands, the non-renewal, and the diminished one-year term.

258. Defendant Costello personally participated in the deprivation through, among other conduct, the recorded interrogations of March 2023 and January 2024, the executive-session directives restricting Ms. DeVaul, her disclosures at the concealed North Marion Meeting, her votes against every renewal term, and her motion to let the Superintendent's contract expire.

259. Defendant Rogers personally participated in the deprivation through, among other conduct, his surveillance of the two women's social-media accounts, his recusal demand, his disclosures at the concealed North Marion Meeting, and his votes against every renewal term and against reconsideration.

260. Defendant Saunders personally participated in the deprivation through, among other conduct, the executive-session directives of August and December 2025, his votes against every renewal term, the March 27, 2026 closed-door meeting, and his July 27, 2026 statements and written acknowledgment.

261. No important governmental interest justifies that differential treatment.

35

262. A county board of education acting by formal vote is a final policymaker whose decisions constitute official policy, and a single such decision suffices for municipal liability.

263. The non-renewal vote, the executive-session directives, and the one-year-term vote were each official acts of the Board's final policymaking authority, and the Board's liability is predicated upon those policymaking acts and not upon any theory of respondeat superior.

264. The Marion County Board of Education is a local political subdivision and is not an arm of the State of West Virginia, and is therefore subject to suit under 42 U.S.C. § 1983 and not entitled to Eleventh Amendment immunity.

265. At all times relevant herein, the Board retained and exercised full local governing authority over the matters at issue and was not subject to any intervention or takeover by the West Virginia Board of Education under W. Va. Code § 18-2E-5 that divested it of its decision-making authority.

266. The Individual Defendants are not entitled to qualified immunity, as the right of a public employee to be free from intentional sex discrimination, including discrimination resting upon sex-based stereotypes, was clearly established well before the conduct at issue began in 2023.

267. As a direct and proximate result of Defendants' misconduct, Dr. Heston has suffered and will continue to suffer the damages set forth herein.

268. Because the acts of the Individual Defendants were motivated by evil motive or intent and/or involved a reckless or callous indifference to the federally protected rights of Dr. Heston, an award of punitive damages against the Individual Defendants is appropriate to the fullest extent permitted by law.

269.    Such punitive damages are not subject to the pleading requirements, limitations, or different standard of proof set forth in W. Va. Code § 29-12A-7.

270.    Plaintiff is entitled to recovery of costs, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988.

### COUNT V — WEST VIRGINIA HUMAN RIGHTS ACT — SEX DISCRIMINATION
(Against the Marion County Board of Education
and Defendants Costello, Rogers, and Saunders Individually)

271.    Plaintiff hereby incorporates by reference paragraphs 1 through 270 as if stated verbatim herein.

272.    The West Virginia Human Rights Act makes it unlawful for an employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions, or privileges of employment on the basis of sex. W. Va. Code §§ 16B-17-9(1), 16B-17-3(h).

273.    West Virginia courts apply the same analytical framework used under Title VII when construing the Act's prohibition on sex discrimination.

274.    Under that framework, discrimination based on an employer's perception of an employee's sexual orientation is discrimination because of sex.

275.    The Board, through the Individual Defendants, discriminated against Dr. Heston because of her sex and perceived sexual orientation, through the conduct described throughout this Complaint, including as set forth in Count I.

276.    The West Virginia Human Rights Act makes it unlawful for any person to aid, abet, incite, compel, or coerce a discriminatory act. W. Va. Code § 16B-17-9(7)(A).

277.    Each of the Individual Defendants personally participated in, directed, and aided and abetted the discriminatory conduct described herein.

278. The Individual Defendants are not immune from liability under W. Va. Code § 29-12A-5(b)(2), as their acts and omissions were undertaken with malicious purpose, in bad faith, and/or in a wanton or reckless manner, as evidenced by, among other things, their concealment of the North Marion Meeting from the Superintendent and their own recorded acknowledgment that "we're not supposed to say stuff," and Defendant Saunders' July 27, 2026 written acknowledgment that he had repeated statements about Dr. Heston's sexuality to others.

279. As a direct and proximate result, Dr. Heston has suffered and will continue to suffer the damages set forth herein, including emotional distress, humiliation, embarrassment, reputational harm, impairment of future employment opportunities, and loss of enjoyment of life, and the Individual Defendants' willful and malicious conduct supports an award of punitive damages.

280. Plaintiff is entitled to attorney's fees and costs under W. Va. Code § 16B-17-13.

**COUNT VI — WEST VIRGINIA HUMAN RIGHTS ACT — HOSTILE WORK ENVIRONMENT**
**(Against the Marion County Board of Education**
**and Defendants Costello, Rogers, and Saunders Individually)**

281. Plaintiff hereby incorporates by reference paragraphs 1 through 280 as if stated verbatim herein.

282. Dr. Heston was subjected to unwelcome, sex-based conduct sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment, as described throughout this Complaint and set forth in Count II, construed consistently with its Title VII counterpart.

283. The conduct satisfies the factors identified in the Act's implementing regulations, W. Va. Code R. § 71-4-2.4, including, but not limited to, unwelcome physical conduct in the form of Defendant Saunders' demanded hug; threatening verbal abuse, including "put your big

girl panties on," "we are your boss," and "it's not going to get easier"; consistent sexual commentary and innuendo, in the form of three and a half years of rumor, interrogation, and surveillance premised on a fabricated sexual relationship; and frequency, in a course of conduct spanning 2023 through 2026.

284.     Under W. Va. Code R. § 71-4-2.4.5, evidence of the harassment suffered by other employees — including the parallel harassment of Ms. DeVaul — is itself proof that the harassment was pervasive or severe.

285.     The conduct is imputable to the Board, as set forth in Count II.

286.     Each of the Individual Defendants personally engaged in, and aided and abetted, the creation and maintenance of that hostile work environment, and is individually liable under W. Va. Code § 16B-17-9(7)(A).

287.     The Individual Defendants are not immune from liability under W. Va. Code § 29-12A-5(b)(2), as their acts and omissions were undertaken with malicious purpose, in bad faith, and/or in a wanton or reckless manner, as evidenced by, among other things, their concealment of the North Marion Meeting from the Superintendent and their own recorded acknowledgment that "we're not supposed to say stuff," and Defendant Saunders' July 27, 2026 written acknowledgment that he had repeated statements about Dr. Heston's sexuality to others.

288.     As a direct and proximate result, Dr. Heston has suffered and will continue to suffer the damages set forth herein, including emotional distress, humiliation, embarrassment, reputational harm, impairment of future employment opportunities, and loss of enjoyment of life, and the Individual Defendants' willful and malicious conduct supports an award of punitive damages.

289.     Plaintiff is entitled to attorney's fees and costs under W. Va. Code § 16B-17-13.

39

## COUNT VII — WEST VIRGINIA HUMAN RIGHTS ACT — RETALIATION
### (Against the Marion County Board of Education
### and Defendants Costello, Rogers, and Saunders Individually)

290.    Plaintiff hereby incorporates by reference paragraphs 1 through 289 as if stated verbatim herein.

291.    The West Virginia Human Rights Act makes it unlawful to retaliate against a person because she has opposed a practice the Act forbids or has filed a complaint. W. Va. Code § 16B-17-9(7)(C).

292.    Dr. Heston engaged in protected activity as set forth in Count III and throughout this Complaint, and the Board retaliated against her through the materially adverse actions described throughout this Complaint.

293.    Each of the Individual Defendants aided, abetted, incited, compelled, or coerced the retaliatory conduct and personally participated in it, and is individually liable under W. Va. Code § 16B-17-9(7)(A).

294.    The Individual Defendants are not immune from liability under W. Va. Code § 29-12A-5(b)(2), as their acts and omissions were undertaken with malicious purpose, in bad faith, and/or in a wanton or reckless manner, as evidenced by, among other things, their concealment of the North Marion Meeting from the Superintendent and their own recorded acknowledgment that "we're not supposed to say stuff," and Defendant Saunders' July 27, 2026 written acknowledgment that he had repeated statements about Dr. Heston's sexuality to others.

295.    As a direct and proximate result, Dr. Heston has suffered and will continue to suffer the damages set forth herein, including emotional distress, humiliation, embarrassment, reputational harm, impairment of future employment opportunities, and loss of enjoyment of life,

and the Individual Defendants' willful and malicious conduct supports an award of punitive damages.

296.    Plaintiff is entitled to attorney's fees and costs under W. Va. Code § 16B-17-13.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Dr. Donna Heston, respectfully requests that this Honorable Court enter judgment in her favor and against Defendants and grant the following relief:

a.    A declaratory judgment that Defendants' conduct violated Title VII, the Fourteenth Amendment as enforced through 42 U.S.C. § 1983, and the West Virginia Human Rights Act;

b.    Permanent injunctive relief enjoining Defendants from further discrimination and retaliation, requiring the removal of the discriminatory restrictions and conditions imposed on Plaintiff's employment, and requiring the Board to adopt and enforce appropriate anti-discrimination and anti-retaliation measures;

c.    All equitable make-whole relief, including back pay, lost and reduced compensation, the restoration of employment terms commensurate with those Plaintiff would have received absent discrimination, and front pay as appropriate;

d.    Compensatory damages for emotional distress, humiliation, embarrassment, reputational harm, impairment of future employment opportunities, and loss of enjoyment of life, in an amount to be determined at trial, without statutory cap under 42 U.S.C. § 1983 and the West Virginia Human Rights Act, and subject to the applicable statutory limit under Title VII;

e.    Punitive damages against Defendants Costello, Rogers, and Saunders in their individual capacities under 42 U.S.C. § 1983 and the West Virginia Human Rights Act;

f.    Pre-judgment and post-judgment interest as allowed by law;

g.      Reasonable attorney's fees, expert fees, and costs pursuant to 42 U.S.C. §§ 1988 and 2000e-5(k) and W. Va. Code § 16B-17-13; and

h.      Such other and further relief as this Honorable Court deems just and proper.

**THE PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY.**

Dr. Donna Heston,
By Counsel,


/s/ Ryan J. Umina, Esq.
Ryan J. Umina, Esq. (W. Va. Bar No. 13056)
UMINA LEGAL, PLLC
133 Greenbag Road
Morgantown, WV 26501
Phone: (304) 838-8024
ryan@uminalegal.com